ISHEE, J.,
 

 for the Court.
 

 ¶ 1. On March 27, 1999, Dr. Bruce Pa-nuska, Ph.D., suffered a work-related injury when he was struck in the head by a board while working at Mississippi State University (“MSU”). Panuska filed a petition to controvert with the Mississippi Workers’ Compensation Commission on February 7, 2002, and the Appellants, MSU and Mississippi State Institutions of Higher Learning, Self-Insured, filed a motion to dismiss asserting that the two-year statute of limitations had expired. The administrative law judge denied the Appellants’ motion due to the fact that Panuska suffered from two separate medical conditions, and the second condition was not diagnosed until September 6, 2000. The Appellants filed a motion to reconsider, which was denied. The administrative law judge’s order was affirmed by the Commission, which was affirmed by the Circuit Court of Oktibbeha County. The Appellants timely filed this appeal alleging that: (1) the administrative law judge and the Commission used the incorrect legal standard in deciding that the two-year statute of limitations had not run; (2) the administrative law judge and the Commission committed reversible error in ruling that the failure to file a first report of injury precluded the employer and carrier from alleging the affirmative defense of the two-year statute of limitations; and (3) the claim of estoppel and/or res judicata does not apply in precluding review of the statute of limitations issue. Finding no error, we affirm the judgment of the circuit court, which affirmed the Commission’s decision.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. Panuska obtained a Ph.D. from the University of Alaska in 1974 and began teaching at the collegiate level in 1984. In 1991, he joined the faculty of MSU. At the time of his resignation in 2002, he was an associate professor in the Department of Geosciences. As an associate professor, Pa-nuska taught three courses per semester, each of which had three hours of lecture time per week. He also taught advanced labs as part of his courses, attended faculty meetings, and took part in research assignments. His research duties included traveling during the summer to remote locations, such as Alaska, the Bahamas, and Puerto Rico, as well as accompanying students to Virginia, Colorado, and Costa Rica.
 

 I. Injury and Medical Treatment
 

 ¶ 3. In the spring of 1999, the building that housed the MSU Department of Geo-sciences, Hilburn Hall, was being vacated for renovation purposes. On March 27, 1999, Panuska was helping remove materials from the building and attempted to throw a very large rock into a dumpster. The rock landed on a wooden crate, and when Panuska tried to push it over the edge of the crate, the rock landed on a two-by-four board that was situated on a hidden fulcrum. The board flew up toward Panuska and struck him on the forehead just above the hairline. There was a small amount of blood, and Panuska drove himself to the emergency room, where he
 
 *719
 
 was told to rest and take it easy for the weekend.
 

 ¶ 4. Panuska continued experiencing dizziness after the accident, so he followed up with his family physician, Dr. Everett McKibben, on March 31, 1999. Dr. McKibben performed a CT scan and diagnosed the injury as being a hemorrhagic concussion. Dr. McKibben also referred Panuska to a neurosurgeon, Dr. Jimmy Miller, at the Neurosurgical Center in Southaven, Mississippi.
 

 ¶ 5. Dr. Miller first examined Panuska on April 5, 1999. Panuska informed Dr. Miller that: he felt like he was in a mental fog; he was having difficulty concentrating and changing directions; and he was experiencing fatigue, issues with his balance, and tightness in his facial muscles. After examining Panuska’s CT scan and performing a series of basic observational tests, Dr. Miller believed that Panuska was suffering from a cerebral contusion. On May 3, 1999, Dr. Miller ordered an MRA (magnetic resonance angiography) and MRI scan of the head to evaluate a possible endocranial aneurysm and to look at the contusion. Dr. Miller believed that Panuska’s brain, despite having a small amount of blood on it, would heal itself in time. However, he advised Panuska to refrain from participating in a diving trip that he had planned for the summer due to a risk of seizures. Dr. Miller continued monitoring Panuska for the remainder of 1999.
 

 ¶ 6. In January 2000, Panuska told Dr. Miller that he was experiencing rapid eye movement and that he was also experiencing nausea and dizziness when he changed direction. Dr. Miller referred Panuska to another neurosurgeon for a second opinion, Dr. Donna Harrington, and she examined Panuska on February 10, 2000. Dr. Harrington believed that Panuska’s medication was contributing to his dizziness, and she recommended that he taper off the Dilantin. He did, but his symptoms continued. In May 2000, Panuska saw Dr. Harrington again and reported that he was having problems when he rode on elevators, flew in airplanes, and stared at certain patterns. Dr. Harrington prescribed two medications for Panuska, but neither of them offered him any relief, so Dr. Harrington referred Panuska to the Shea Ear Clinic.
 

 ¶ 7. At the Shea Ear Clinic, Panuska was treated by Dr. Bruce Fetterman, an otologist/ neuro-otologist who specializes in ear, hearing, and balance disorders. On September 6, 2000, Dr. Fetterman saw Panuska and ordered several tests to be performed by audiologists. He diagnosed Panuska’s injury as a labyrinthine concussion, which he described as trauma to the inner ear that disrupts the inner ear’s balance function and causes dizziness. Dr. Fetterman believed the labyrinthine concussion was the direct result of Panuska’s March 1999 accident.
 

 ¶ 8. Beginning on January 16, 2001, Pa-nuska began undergoing physical therapy treatment, as prescribed by Dr. Fetter-man, at the Oktibbeha County Hospital under the care of a physical therapist, Glenda Tranum. Tranum testified that Panuska was cooperative with the treatment, but they discontinued therapy on March 2, 2001, when the treatment did not appear to be improving Panuska’s symptoms. Dr. Fetterman treated Panuska for a second time on May 2, 2002.
 

 ¶ 9. A hearing was held, and Panuska’s treating physicians were called to testify. Dr. Miller testified that he was not familiar with a labyrinthine concussion, nor was he aware of all of the symptoms. He further stated that he did not have any expertise in diagnosing a labyrinthine concussion, so he would defer to Dr. Fetter-man’s opinions on the subject. Dr. Har
 
 *720
 
 rington confirmed that Panuska had not been diagnosed with the labyrinthine concussion prior to Dr. Fetterman’s diagnosis, and she also testified that she would defer to Dr. Fetterman’s opinions regarding the labyrinthine concussion. Dr. Fetterman was not surprised that Dr. Miller and Dr. Harrington were not familiar with the labyrinthine concussion, because it is a rare condition. Dr. Fetterman believed that Panuska’s condition was the direct result of the accident and had been present from the beginning. Dr. Fetterman noted that because Panuska’s earlier treating physicians practiced outside of his specialty, the fact that they had not diagnosed the condition as a labyrinthine concussion earlier was not unusual.
 

 II. Symptoms
 

 ¶ 10. Due to the traumatic injury of Panuska’s inner ear, he says that he now experiences symptoms that are triggered by everyday endeavors. For example, in a classroom setting, he is not able to move his head back and forth to look between the students and the blackboard, nor is he able to look at students wearing patterned clothing. In addition, if a student bumps a slide projector, which Panuska uses daily, the motion of the image may trigger an “episode,” causing a dramatic decrease in the speed of his thought process and word choice. Such episodes have negatively affected his teaching evaluations. Also, departmental meetings with over-crowded tables and people wearing patterned clothing now make Panuska ill. Finally, Panuska is no longer able to tolerate looking at a computer screen unless he has complete control of it, which renders him unable to attend computer training sessions, to attend seminars where PowerPoint presentations are used, and to use the Internet.
 

 ¶ 11. The symptoms have also had a negative impact on his personal life. Symptoms are triggered by flashing lights, being bumped by others, clothing patterns, wall and floor patterns, digital credit card signature recorders, excessive mirrors, escalators, and other everyday encounters. Furthermore, his ability to drive and exercise has been limited.
 

 ¶ 12. Regarding Panuska’s employability, Dr. Fetterman testified that Panuska “[could] not be a college professor because of what his job entail[ed].” In addition, Donald E. Woodall, a vocational rehabilitation expert who was retained to evaluate Panuska’s employment prospects, testified that he believed Panuska was incapable of returning to work as an associate professor or in any other job in the national economy in which he could be reasonably competitive.
 

 STANDARD OF REVIEW
 

 ¶ 13. An appellate court has a limited role when considering the appeal of a decision by the Mississippi Workers’ Compensation Commission.
 
 Posey v. United Methodist Senior Servs.,
 
 773 So.2d 976, 979(¶ 6) (Miss.Ct.App.2000). In a compensation claim, the Commission serves as the trier and finder of fact, and we will only reverse if a Commission’s order is clearly erroneous, manifestly wrong, or contrary to the weight of the credible evidence.
 
 Id.
 
 at 978(¶ 5).
 

 ANALYSIS
 

 Statute of Limitations
 

 ¶ 14. Panuska’s injury occurred on March 27,1999, and he filed the petition to controvert on February 7, 2002; therefore, the Appellants argue that the petition was barred by the two-year statute of limitations set forth in Mississippi Code Annotated section 71-3-35(1) (Rev.2000). Pa-nuska, on the other hand, maintains that his petition was not barred because the
 
 *721
 
 statute of limitations did not begin running until his labyrinthine concussion was diagnosed on September 6, 2000.
 

 ¶ 15. The statute provides that “if no payment of compensation (other than medical treatment or burial expense) is made and no application for benefits [is] filed ■with the commission within two years from the date of the injury or death, the right to compensation therefor shall be barred.” Miss.Code Ann. § 71-3-35(1). The parties do not dispute the two-year limitation. Rather, the issue is whether the statute of limitations began to run at the time of the injury or at the time the labyrinthine concussion was diagnosed.
 

 ¶ 16. The supreme court has consistently held that “the two[-]year statute of limitations will not begin to run until by reasonable care and diligence it is discoverable and apparent that a compensa-ble injury has been sustained.”
 
 Benoist Elevator Co., Inc. v. Mitchell,
 
 485 So.2d 1068, 1069 (Miss.1986) (citations omitted). The statute is not deemed to have begun running “if the claimant’s reasonably diligent efforts to obtain treatment yield no medical confirmation of compensable injury.”
 
 Ga. Pac. Corp. v. Taplin,
 
 586 So.2d 823, 827 (Miss.1991). Mississippi law “do[es] not penalize workers when they, with their physicians’ assistance, cannot confirm that their injuries are compensa-ble.”
 
 Id.
 

 ¶ 17. The blow to Panuska’s head on March 27, 1999, caused two separate injuries, the cerebral contusion and the labyrinthine concussion. Panuska was diligent in his efforts to reveal the source of his symptoms and visited a number of physicians from a variety of specialties. The cerebral contusion, which was diagnosed immediately, was an injury from which Panuska was able to recover and continue working as a college professor. There was no reason for Panuska to file a claim regarding the cerebral contusion because he had been assured by Dr. Miller, a neurosurgeon, that his condition would heal itself in time. It was not until Dr. Fetter-man diagnosed the labyrinthine concussion that Panuska learned he had suffered a permanent injury and that he would not be able to return to work. Panuska had no way of knowing that he had suffered a compensable injury until he was properly diagnosed. Furthermore, it was not until after a number of failed medications and treatment options that he realized his condition was permanent.
 

 ¶ 18. We agree with the Commission that the statute of limitations for the labyrinthine concussion began to run at the time it was diagnosed on September 6, 2000. Therefore, Panuska acted within the two-year limit by filing the petition to controvert on February 7, 2002. This issue is without merit.
 

 ¶ 19. Because we affirm the judgment of the circuit court, which affirmed the decision of the Commission regarding the statute of limitations, there is no need to address the additional issues presented in this appeal.
 

 ¶ 20. THE JUDGMENT OF THE CIRCUIT COURT OF OKTIBBEHA COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ROBERTS AND CARLTON, JJ., CONCUR. MAXWELL, J., NOT PARTICIPATING.